UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONDODOMAIN, LLC, and ANTHONY JAMES LONGO, JR., d/b/a BLOCKAVENUE.COM<br><br>        Plaintiffs,<br><br>    vs.<br><br>JASON B. COLANTUONI AND BRIAN HOLT<br>        Defendants. | Case No. |

## COMPLAINT AND JURY DEMAND

### JURISDICTION AND VENUE

1. This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332 based on diversity of citizenship. The Plaintiffs and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because this is the district in which a substantial part of the injuries and events or omissions giving rise to the claim occurred, and where a substantial part of the property that is the subject of the action is situated. The establishment of the business relationship and the agreement of the essential elements of the

contract which form the nexus of the business relationship and which are central to this dispute all occurred in Massachusetts.

## PARTIES

4. The Plaintiff, CondoDomain, LLC., ("CondoDomain") is a Delaware limited liability company that is engaged in Internet media and real estate with it's principle office located at110 Greene Street, Suite 1109, New York, NY 10012.

5. The Plaintiff Anthony James Longo, d/b/a BlockAvenue.com., ("BlockAvenue") is a resident of New York, residing at 89 Murray Street, New York, NY. Longo is also the president and primary shareholder of CondoDomain, LLC.

6. Upon information and belief, the Defendant, Jason Colantuoni ("Colantuoni") is a Massachusetts Resident, residing at 61 Ledgewood Rd., Framingham, MA 01701-3666.

7. Upon information and belief, the Defendant, Brian ("Holt") is a Massachusetts Resident, residing at197M Boston Post Road Apt. 181, Marlborough, MA 01752.

## FACTUAL ALLEGATIONS

8. On or about June 29, 2011, Colantuoni[1] signed a non-disclosure, non-competition and IP rights Agreement with BlockAvenue in order for Longo to allow him access to the BlockAvenue servers as a prospective web developer. (See Exhibit 1, attached hereto).

9. On or about July 7, 2011, Longo asked Kevin Fling ("Fling"), a free-lance web engineer to terminate Colantuoni's access to the blockavenue Internet servers because Longo had decided not to engage him as a web developer.

10. On July 8, 2011, Longo contacted Colantuoni and told him he was no longer interested

---

[1] It was later determined via Police investigation that the individual who Longo met as a perspective web designer for Blockavenue, and who signed a nondisclosure, non-competition and IP Property rights agreement, was in fact Brian Holt, a business partner of Colantuoni.

in hiring him.

11. Later that morning, Longo and Fling recognized that the Blockavenue website and all of it's content and user generated reviews on the server had been deleted, but the "about us" page was left live, and read "I like to waste people's time."

12. Fling and Longo[2] were able to determine immediately that the information for the IP address that had deleted BlockAvenue and all of it's content belonged to Colantuoni and Holt.

13. Longo contacted Colantuoni and requested Colantuoni send all of the BlockAvenue Web operating information as Colantuoni deleted all of the backups contained on the server.

14. Colantuoni refused to do so, and Longo proceeded to file a police report at the South Boston Police Department.

15. As a result of Colantuoni and Holt's actions, the seven (7) months of web development and seven (7) months of marketing to attract the user-generated content on Blockavenue was permanently destroyed and impossible to recover in its whole.

16. Beginning on July 8, 2011, Fling and Longo began the process of attempting to retrieve any data that they could from blockavenue and to date, have spent over One Hundred and Fifty (150) hours collectively to this effect.

17. On August 11, 2011, Longo determined that there had been a on the CondoDomain, LLC servers.

18. Fling looked into the attack and quickly determined that Colantuoni launched a formidable hack attack on the CondoDomain servers.

19. Upon further research, Fling determined the attack was coming from the IP address belonging to SEOETTE, the company that Jason Colantuoni and Brian Holt allegedly own.

---

[2] Longo is also an Internet Engineer and has put in over eighty (80) hours to date in attempting to repair and rebuild BlockAvenue.

20. As a result of the attacks on CondoDomain on August 11, 2011,there were multiple extremely harmful effects on the CondoDomain servers: (1) launching thousand of SPAM messages rendering the mail servers and lead flow to CondoDomain employees useless for 48 Hours; (2) a unmistakable attempt to gain access and steal passwords from the CondoDomain servers so that they could also attempt to steal proprietary information while assuming to bring down CondoDomain as they did Blockavenue.

21. On August 11, 2011, Longo wrote an email to Colantuoni and Holt demanding that they stop their illegal actions, stop portscanning, SPAMING, and overall demanding that they never visit the websites again.

22. Colantuoni and Holt responded to Longo by threatening the reputation of Longo personally, threatening the reputation of CondoDomain and Blockavenue within 24 hours.

23. Additionally, Longo received a phone call from Colantuoni stating that if he went to the police he would "kill him".

## CAUSES OF ACTION

### COUNT I
### Breach of Contract
### Anthony Longo, Jr., d/b/a BlockAvenue.com v. Jason Colantuoni

24.     BlockAvenue repeats and realleges and incorporates by reference paragraphs 1 through 23 of the instant Complaint as if expressly rewritten and set forth herein.

25.     Colantuoni entered into a written non-disclosure, non-competition and IP Prperty Rights Agreement in order for Colantuoni to gain access to the BlockAvenue servers as a potential web-designer.

26.     By the terms of the agreement, Colantuoni had a duty not to disclose, compete against, harm or otherwise injure BlockAvenue.

27.     At all times hereto, BlockAvenue acted in good faith and operated under the terms of the aforementioned agreement.

28.     Colantuoni materially breached his duty and defeated the purpose of the agreement by destroying BlockAvenue and all of it's contents.

29.     By relying on Colantuoni's promise under the aforesaid agreement, BlockAvenue was substantially injured. Longo has expended well over 80 hours and travel related expenses in connection with Colantuoni's failure to abide by the terms of the agreement as well as being forced to engage a Internet Specialist who has spent over 50 hours of time in repairs.

WHEREFORE, Plaintiff BlockAvenue demands judgment against Colantuoni in a sum equal to it's damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

## COUNT II
### Breach of Contract
### Anthony Longo, Jr., d/b/a BlockAvenue.com v. Brian Holt

30.     BlockAvenue repeats and realleges and incorporates by reference paragraphs 1 through 29 of the instant Complaint as if expressly rewritten and set forth herein.

31.     Colantuoni entered into a written non-disclosure, non-competition and IP Prperty Rights Agreement in order for Colantuoni to gain access to the BlockAvenue servers as a potential web-designer.

32.     By the terms of the agreement, Colantuoni had a duty not to disclose, compete against, harm or otherwise injure BlockAvenue.

33.     It was later determined through police investigation that the person Longo met with and who signed the non-disclosure, non-competition and IP Property Rights Agreement was in fact Brian Holt, a business partner of Colantuoni.

- 5 -

34.    At all times hereto, BlockAvenue acted in good faith and operated under the terms of the aforementioned agreement.

35.    Holt materially breached his duty and defeated the purpose of the agreement by destroying BlockAvenue and all of it's contents.

36.    By relying on Holt's promise under the aforesaid agreement, BlockAvenue was substantially injured. Longo has expended well over 80 hours and travel related expenses in connection with Holt's failure to abide by the terms of the agreement as well as being forced to engage a Internet Specialist who has spent over 50 hours of time in repairs.

WHEREFORE, Plaintiff BlockAvenue demands judgment against Holt in a sum equal to it's damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

## COUNT III
### Interference with Advantageous Relations
### BlockAvenue v. Colantuoni

37.    BlockAvenue repeats and realleges and incorporates by reference paragraphs 1 through 36 of the instant Complaint as if expressly rewritten and set forth herein.

38.    Colantuoni knew that BlockAvenue was in the BETA development stage and was looking for potential investors. Colantuoni also signed a non-disclosure, non-competition and IP Property Rights Agreement with BlockAvenue.

39.    On June 8, 2011, after his access had already been terminated, Colantuoni deleted the entire Blockavenue website and all of it's content and user generated reviews from the server, leaving the "about us" page live which read "I like to waste people's time."

40.    As a result of Colantuoni's actions BlockAvenue was left un-operational.

41.    Colantuoni's intentional and malicious interference obstructs BlockAvenue's business opportunities and has prevented advantageous opportunities and business development.

42.     Further, Colantuoni's intentional and malicious interference obstructs
BlockAvenue's ability to retain investors, and develop advantageous business opportunities.

43.     BlockAvenue will suffer imminent damage to their business relationships as a
result of Colantuoni's intentional and malicious interference. This harm is immediate,
irreparable, and on going.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment
against Colantuoni in a sum equal to it's future damages and losses, plus attorneys' fees and all
expenses and costs of this litigation together with interest thereon.

## COUNT IV
### Interference with Advantageous Relations
### BlockAvenue v. Holt

44. BlockAvenue repeats and realleges and incorporates by reference paragraphs 1
through 44 of the instant Complaint as if expressly rewritten and set forth herein.

45. Holt knew and understood that BlockAvenue was in the BETA development stage
and was looking for potential investors. Holt, under the name of Colantuoni, also signed a non-
disclosure, non-competition and IP Property Rights Agreement with BlockAvenue.

46. On June 8, 2011, after his access had already been terminated, Holt deleted the entire
Blockavenue website and all of it's content and user generated reviews from the server, leaving
the "about us" page live which read "I like to waste people's time."

47.     As a result of Holt actions BlockAvenue was left un-operational.

48.     Holt's intentional and malicious interference obstructs BlockAvenue's business
opportunities and has prevented advantageous opportunities and business development.

49.     Further, Holt's intentional and malicious interference obstructs BlockAvenue's
ability to retain investors, and develop advantageous business opportunities.

50.    BlockAvenue will suffer imminent damage to their business relationships as a result of Holt's intentional and malicious interference. This harm is immediate, irreparable, and on going.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment against Holt in a sum equal to it's future damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

### COUNT V
### Malicious Destruction of Property
### BlockAvenue v. Colantuoni

51.    BlockAvenue repeats and realleges and incorporates by reference paragraphs 1 through 50 of the instant Complaint as if expressly rewritten and set forth herein.

52.    Colantuoni intentionally and willfully destroyed BlockAvenue website, servers and web-based content.

53.    As a result BlockAvenue has sustained damages in excess of $75,000.00 and permanent damage to it's reputation.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment against Colantuoni in a sum equal to it's future damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

### COUNT VI
### Malicious Destruction of Property
### BlockAvenue v. Holt

54.    BlockAvenue repeats and realleges and incorporates by reference paragraphs 1 through 53 of the instant Complaint as if expressly rewritten and set forth herein.

54.    Holt intentionally and willfully destroyed BlockAvenue website, servers and web-based content.

55. As a result BlockAvenue has sustained damages in excess of $75,000.00 and permanent damage to it's reputation.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment against Holt in a sum equal to it's future damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

### COUNT VII
### Malicious Destruction of Property
### CondoDomain v. Colantuoni

56. CondoDomain repeats and realleges and incorporates by reference paragraphs 1 through 55 of the instant Complaint as if expressly rewritten and set forth herein.

57. BlockAvenue repeats and realleges and incorporates by reference paragraphs 1 through 44 of the instant Complaint as if expressly rewritten and set forth herein.

58. Colantuoni intentionally and willfully launched a variety of malicious hacking attempts on the CondoDomain website, servers and web-based content. This had multiple effects on the CondoDomain servers including inundating the form submission functionality of the website and mail servers, and rendered the lead flow to CondoDomain employees useless for 48 hours.

59. As a result CondoDomain has sustained damages in excess of $75,000.00 and permanent damage to it's reputation.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment against Colantuoni in a sum equal to it's future damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

## COUNT VII
## Malicious Destruction of Property
## CondoDomain v. Colantuoni

60. CondoDomain repeats and realleges and incorporates by reference paragraphs 1 through 59 of the instant Complaint as if expressly rewritten and set forth herein.

61. BlockAvenue repeats and realleges and incorporates by reference paragraphs 1 through 44 of the instant Complaint as if expressly rewritten and set forth herein.

62. Colantuoni intentionally and willfully launched a variety of malicious hacking attempts on the CondoDomain website, servers and web-based content. This had multiple effects on the CondoDomain servers including inundating the form submission functionality of the website and mail servers, and rendered the lead flow to CondoDomain employees useless for 48 hours.

63. As a result CondoDomain has sustained damages in excess of $75,000.00 and permanent damage to it's reputation.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment against Colantuoni in a sum equal to it's future damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

## COUNT IV
## Interference with Advantageous Relations
## CondoDomain v. Colantuoni

64. CondoDomain repeats and realleges and incorporates by reference paragraphs 1 through 63 of the instant Complaint as if expressly rewritten and set forth herein.

65. Holt knew and understood that CondoDomain is a highly successful and venture backed company.

66. As a result of Colantuoni actions CondoDomain was left un-operational for 48 hours.

67.     Colantuoni's intentional and malicious interference obstructs CondoDomain's business opportunities, has prevented advantageous opportunities, business development and interferes with ongoing business activities and relationships with clients and customers. .

68.     CondoDomain will suffer imminent damage to their business relationships as a result of Holt's intentional and malicious interference. This harm is immediate, irreparable, and on going.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment against Holt in a sum equal to it's future damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

## COUNT IV
### Interference with Advantageous Relations
### CondoDomain v. Colantuoni

69. CondoDomain repeats and realleges and incorporates by reference paragraphs 1 through 68 of the instant Complaint as if expressly rewritten and set forth herein.

70. Colantuoni knew and understood that CondoDomain is a highly successful and venture backed company.

71. As a result of Colantuoni actions CondoDomain was left un-operational for 48 hours.

72.     Colantuoni's intentional and malicious interference obstructs CondoDomain's business opportunities, has prevented advantageous opportunities, business development and interferes with ongoing business activities and relationships with clients and customers. .

73     CondoDomain will suffer imminent damage to their business relationships as a result of Holt's intentional and malicious interference. This harm is immediate, irreparable, and on going.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment against Holt in a sum equal to it's future damages and losses, plus attorneys' fees and all expenses and costs of this litigation together with interest thereon.

RELIEF REQUESTED

WHEREFORE, the Plaintiffs request that this Court award them the following relief:

A. Enter judgment in their favor against each of the Defendants in an amount warranted by the evidence at trial;

B. Direct the Defendants to make the Plaintiffs whole for all compensation they would have received but for the Defendants' unjustified conduct;

C. Award reasonable attorneys' fees and costs; and

E. Grant such other and further relief as this Court deems necessary and proper.

**<u>PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.</u>**

Respectfully submitted,

CondoDomain, LLC,
Anthony J. Longo, Jr., d/b/a
BlockAvenue.com

By their attorney,

Peter Charles Horstmann, Esquire
BBO# 55637
PARTRIDGE, ANKNER & HORSTMANN, LLP
200 Berkeley Street, 16th Floor
Boston, MA 02116
(617) 859-9999

Dated: August 12, 2010

## NONDISCLOSURE, NON-COMPETITION and IP PROPERTY RIGHTS AGREEMENT

This NONDISCLOSURE, NON-COMPETITION and INTELLECTUAL PROPERTY RIGHTS AGREEMENT (this "Agreement") is entered into as of this _Ol_ day of _JUNE_, 20 _11_ (the "Effective Date") by and between _JASON COLANTUON_, a company/individual residing at _193 Boston Post rd 01750_ ("Recipient"), and Anthony J Longo as an individual whom founded this idea and program to create and host block by block street reviews currently called BlockAvenue.com (as the "Company", with an address at 89 Murray Street, New York, NY 10007 and together with its affiliates, principals, employees and agents, the "Disclosing Party"). Recipient and Company are individually referred to as a "Party," or collectively the "Parties".

WHEREAS, the Company owns certain confidential, proprietary, commercial and technical information relating to existing or contemplated business (the "Business"), including but not limited to aggregating, formatting, creating or distributing real estate data, real estate websites, real estate blogs, real estate transaction records, real estate information or real estate internet /software technology (defined more particularly herein, the "Confidential Information");

WHEREAS, the Parties agree that such Confidential Information represents a legitimate, valuable and protected interest of Disclosing Party and gives Disclosing Party a competitive advantage which otherwise would be lost if such Confidential Information were improperly disclosed, revealed or used without the express written authorization of Disclosing Party;

WHEREAS, the Recipient has been offered an engagement with Company on a 1099 contractor basis and the Company desires to utilize the Recipient to assist with the Business (the "Purpose"), including but not limited to, the development, implementation, deployment, planning, sales and/or marketing of products and services for the Business; and

WHEREAS, this Agreement is intended to set forth the rights and obligations of the Parties with respect to Confidential Information both during the term of this Agreement and thereafter.

NOW, THEREFORE, in consideration of the covenants set forth herein, and for other good and valuable consideration the adequacy and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.	"Confidential Information" shall mean any and all information disclosed by the Disclosing Party to the Recipient, relating to Disclosing Party's business, finances, strategy or technology that Disclosing Party desires to protect under this Agreement, whether in tangible or intangible form and regardless of whether (i) affirmatively disclosed by the Disclosing Party or (ii) learned or generated by reason of the relationship contemplated by this Agreement.   Confidential Information includes, for example and without limitation, Disclosing Party's confidential business or technical information, such as data, financial information or data, marketing techniques and material, business plans and strategies, business operation and systems, software (including both source code and object code), pricing policies, information concerning employees, customers and/or vendors, methods discoveries, inventions (whether or not patentable or reduced to practice), improvements, research, development, know-how, show-how, designs, products, compositions, prototypes, maskworks, physical materials, manufacturing processes and other information disclosed or submitted, orally, in writing, or by any other media, to Recipient by Disclosing Party .  If Confidential Information is disclosed in writing, the Disclosing Party may, but is in no way required to, mark such information as being "Confidential" or "Proprietary". Nothing herein shall require either Party to disclose any information to the other.

2.  Non-Disclosure. Without the express prior written consent of Disclosing Party, Recipient may not:

    a.  publish, disseminate or otherwise disclose or make available Confidential Information received hereunder to any third party, except to regular employees or contractors of the Company having a need to know such information to further the Purpose and provided, that each such employee or contractor is advised of the confidential nature of the Confidential Information and their obligations to treat the same as confidential and in the same manner as provided hereunder;

    b.  make copies of the Confidential Information, except to the extent that the same is strictly required for the Purpose;

    c.  use Confidential Information for any purpose whatsoever (other than solely in furtherance of the Purpose) including, without limitation, selling, leasing, renting, licensing, marketing or otherwise distributing any Confidential Information or products or services embodying or derived from same; or

    d.  alter, modify, break-down, disassemble, or reverse engineer materials, compositions or code containing or constituting Confidential Information.

    Recipient agrees to use a reasonable degree of care in order to prevent any unauthorized disclosure of Confidential Information.

3.  Non-Competition. The Recipient agrees that for the period commencing on the Effective Date and ending on the first (1st) anniversary date of the later of Recipient's termination with the Company or the Effective Date (the "NonCompetition Period"), the Recipient shall not serve as, be a consultant to, or an independent contractor, employee, officer, agent, director or owner of: (a) any individual, corporation, partnership or other entity that competes, directly with the Business or the Company ("Competitive Business") anywhere in any state of the United States of America (the "Territory"). The covenants set forth in this Section 3 shall be construed as a series of separate covenants covering their subject matter in each of the separate states where the Company anticipates doing business, and except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant set forth above in this Section 3. To the extent that any such covenant shall be judicially unenforceable in any one or more of such state, such covenant shall not be affected with respect to each of the other states in the Territory. Each covenant with respect to such state in the Territory shall be construed as severable and independent. The Recipient further agrees that during the NonCompetition Period, they shall not: (i) employ or solicit for employment or endeavor in any way to entice away from employment or engagement with the Company or its affiliates any employee or independent contractor of the Company or its affiliates; or (ii) solicit, induce or influence any supplier, customer, agent, consultant, independent contractor or other person or entity that has a business relationship with the Company to discontinue, reduce or modify such relationship with the Company.

4.  Trade Secrets. All trade secrets of the Company will be entitled to all of the protection and benefits under all applicable federal and state trade secrets law. If any information that the Company deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this Agreement, such information will, nevertheless, be considered Confidential Information for purposes of this Agreement. Recipient hereby waives any requirement that the Company submit proof of the economic value of any trade secret or post a bond or other security.

5.  Consideration. The Recipient has agreed to enter into this Agreement in exchange for the

opportunity of engagement as an independent contractor with the Company. Recipient hereby accepts this and other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, in exchange for entering into this Agreement.

6.   RECIPIENT HAS CAREFULLY READ AND CONSIDERED THE PROVISIONS OF SECTIONS 1-5 HEREOF AND, HAVING DONE SO, HEREBY AGREES THAT THE RESTRICTIONS SET FORTH IN SUCH SECTIONS ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF THE INTERESTS OF THE COMPANY AND THE BUSINESS. The Recipient represents that his/her education, experience, training and capabilities are such that the enforcement of the provisions of this Agreement, including, without limitation, Sections 1-5 hereof, would not preclude him/her from earning an adequate livelihood for himself/herself and his/her dependents.

7.   Recipient shall notify Disclosing Party in writing immediately upon discovery of any unauthorized use or disclosure of Confidential Information by Recipient or any third party, and will reasonably cooperate with Disclosing Party to regain possession of the Confidential Information and prevent its further unauthorized use.

8.   Recipient shall have no obligation under this Agreement to maintain in confidence any information which is lawfully publicly disclosed by Recipient pursuant to an order by a court of competent jurisdiction, provided  Recipient makes all reasonable efforts to obtain a protective order, and provided that  Recipient notifies Disclosing Party prior to such disclosure, in no case more than ten (10) days after first becoming aware that such order is being sought, to give Disclosing Party time to contest the same or seek a protective order or other confidential treatment. Recipient will maintain the confidentiality of the Confidential Information even though such information may be in the public domain. IT IS SPECIFICALLY UNDERSTOOD AND AGREED BY THE RECIPIENT THAT WHILE A SIGNIFICANT PORTION OF THE DATA THE COMPANY INTENDS TO USE AS A CORE PART OF ITS BUSINESS IS PUBLIC INFORMATION, THE CONCEPT OF THE COLLECTION, FORMATTING AND DISSEMINATION OF THAT INFORMATION IN THE CONTEMPLATED MANNER IS UNIQUE AND CONSTITUTES A VIABLE BUSINESS PLAN, THE DEVELOPMENT OF WHICH DESERVES PROTECTION. ADDITIONALLY, IT IS UNDERSTOOD THAT COMPANY INTENDS TO DEVELOP ITS BUSINESS PLAN IN A SELECT FEW MARKETS WITH ULTIMATE PLANS TO ROLL OUT THE BUSINESS ON A NATIONAL BASIS.

9.   Unless otherwise explicitly set forth in writing, all materials furnished to Recipient by Disclosing Party, including without limitation documents, drawings, apparatus, sketches, designs, physical materials, Confidential Information, and media upon which Confidential Information is stored or recorded, shall remain the property of Disclosing Party. None of the Confidential Information which may be disclosed to Recipient shall constitute any representation, warranty, assurance, guarantee or inducement by either Party to the other of any kind, and, in particular, with respect to the non-infringement of trademarks, patents, copyrights, mask protection rights or any other intellectual property rights, or other rights of third persons or of either Party. ALL INFORMATION OF DISCLOSING PARTY IS FURNISHED ON AN "AS-IS" BASIS, WITHOUT WARRANTY OF ANY KIND INCLUDING THAT OF ACCURACY, OR OF FITNESS OR SUITABILITY FOR ANY PURPOSE. Recipient will return all such material, and all copies thereof (including, without limitation, Derivatives, as such term is defined in the following Section), to Disclosing Party within fifteen (15) days following Disclosing Party's written request. Upon termination of this Agreement and/or the return of Confidential Information and Derivatives to Disclosing Party, Recipient shall destroy all documents and "wipe clean" beyond restoration all media created by or on behalf of Recipient that incorporate any of the Confidential Information provided by or acquired from Disclosing Party or any Derivatives. This Agreement does not

give Recipient a license, implied or express, or other rights to the Confidential Information or any Derivatives.

10.    For purpose of this Agreement, "Derivatives" shall mean:    (i) for copyrightable or copyrighted material, any translation, abridgment, revision, or other form in which an existing work may be recast, transformed or adapted; (ii) for any unpatented invention, patentable or patent pending material, any improvement thereon; and (iii) for other material whether or not protected by trade secret, any new material, product, idea, concept, invention or discovery derived from such material, including new material, product, idea, concept, invention or discovery which may be protectable by copyright, patent, and/or trade secret. Any and all Derivatives of Confidential Information made or developed by or for Recipient shall be, as between the parties, the property of Disclosing Party.    Upon development thereof, Recipient shall promptly provide a full and correct copy of any and all Derivatives made or developed by or for the Recipient to Disclosing Party and identify any information therein known or believed to be the intellectual property of third parties.    In case of doubt, Recipient shall have the burden of demonstrating that any alleged derivative is independent of Confidential Information disclosed by the Company and therefore not the property of the Company.

11.    The Derivatives contributed by the Recipient hereunder shall be considered a "work made for hire" as defined by the copyright laws of the United States. If for any reason the Derivatives of Confidential Information are determined at any time not to be the property of the Company, the Recipient hereby (i) irrevocably transfers and assigns to the Company all right, title and interest therein, including all patents and copyrights, as well as all renewals and extensions thereto; (ii) agrees that the Company may make any changes or additions to the Derivatives, which the Company decides in its sole discretion may be necessary, and may engage others to do any or all of the foregoing, with or without attribution and payment to the Recipient; (iii) agrees to waive any so-called moral rights in the Derivatives.

12.    All inventions, discoveries, computer programs, data, technology, designs, innovations and improvements (whether or not patentable and whether or not copyrightable) ("Inventions") related to the Business of the Company which are made, conceived, reduced to practice, created, written, designed or developed by the Recipient, solely or jointly with others and whether during normal business hours or otherwise, in the course of providing services to the Company, shall be the sole property of the Company, and shall be a "work made for hire" (as defined by the copyright laws of the United States). The Company shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of your services hereunder in whatever stage of completion. If for any reason the results and proceeds of your services hereunder are determined at any time not to be a "work made for hire", you hereby irrevocably transfer and assign to us all right, title and interest therein, including all copyrights, as well as all renewals and extensions thereto. The Recipient hereby assigns to the Company all Inventions and any and all related patents, copyrights, trademarks, trade names, and other industrial and intellectual property rights and applications therefor, in the United States and elsewhere and appoints any officer of the Company as his duly authorized attorney to execute, file, prosecute and protect the same before any government agency, court or authority. Upon the request of the Company and at the Company's expense, the Recipient shall execute such further assignments, documents and other instruments as may be necessary or desirable to fully and completely assign all Inventions to the Company and to assist the Company in applying for, obtaining and enforcing patents or copyrights or other rights in the United States and in any foreign country with respect to any Invention. The Recipient also hereby waives all claims to moral rights in any Inventions. The Recipient shall promptly disclose to the Company all Inventions and will maintain adequate and current written records (in the form of notes, sketches,

drawings and as may be specified by the Company) to document the conception and/or first actual reduction to practice of any Invention. Such written records shall be available to and remain the sole property of the Company at all times.

13. The Parties acknowledge that a breach of this Agreement by Recipient will cause Disclosing Party irreparable injury that would not be adequately compensated by the award of monetary damages. Thus, notwithstanding anything in this Agreement to the contrary, in addition to all other remedies available at law or equity, Disclosing Party will be entitled to seek specific performance and injunctive or other equitable relief against the breach or threatened breach of this Agreement. The Parties acknowledge and agree that the covenants contained herein are necessary for the protection of the Companies legitimate business interests and are reasonable in scope and content.

14. This Agreement shall be governed and interpreted in accordance with the laws of the State of Delaware without regard to principles of conflict of laws. Both Parties consent and submit to the exclusive jurisdiction of the courts (State and Federal) located in the State of Delaware, United States of America in connection with any controversy arising under this Agreement or its subject matter. The Parties hereby waive any objection they may have in any such action based on lack of personal jurisdiction, improper venue or inconvenient forum. The Parties further agree that service of any process, summons, notice or document by U.S. registered mail to its respective address set forth above shall be effective legal service for any litigation brought in such courts. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which he may be entitled.

15. This Agreement constitutes the entire agreement between the Parties hereto regarding the Confidential Information disclosed thereunder and any Derivatives and Inventions and supersedes all oral or written agreements, either entered prior to or contemporaneously with this Agreement, concerning the Confidential Information, Derivatives and Inventions. This Agreement may not be modified except by written agreement dated subsequent to the date of this Agreement and signed by both Parties.

16. The Recipient shall not assign or transfer any rights or obligations under this Agreement without the prior written consent of the Company. The Company may assign its rights under this Agreement, including but not limited to any new entity created by the Company or its principals related to the Business. Subject to the limitations set forth in this Agreement, this Agreement will inure to the benefit of and be binding upon the Parties, their successors and assigns.

17. Any notice, demand or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if sent by personal delivery, recognized overnight courier, registered or certified mail, postage and charges prepaid, or facsimile to the parties at the addresses set forth opposite their signatures to this Agreement, upon the earlier of (a) the second business day after such notice, demand or communication was sent or (b) receipt by the party to whom such notice, demand or communication was sent.

18. It is expressly understood and agreed that this Agreement shall not be construed as obligating either Party to enter into or continue for any length of time any contract, subcontract or other business relationship with the other Party, nor does it grant to either Party any exclusive privileges or rights. This Agreement is neither intended to create, nor will it create, a joint venture, partnership or other form of business association.

19.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be unenforceable, the remaining provisions shall remain in full force and effect. A waiver by either of the Parties hereto of (or a failure by either of such Parties to enforce) any of the covenants to be performed by the other Party or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any covenant herein contained.

**[End of document; signatures on following page]**

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Agreement as of the date first above written.

By: Anthony James Longo, Founder       By: _____

Jason Colantuoni